**Bobbie J. ROBERTS,
Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 87–4931.

United States Court of Appeals,
Fifth Circuit.

Nov. 14, 1988.

Ben A. Douglass, Douglas, Kressler & Wuester, Fort Worth, Tex., for petitioner-appellant.

William F. Nelson, Chief Counsel, IRS, Janet A. Bradley, Gary R. Allen, Wm. S. Rose, Jr., Jonathan S. Cohen, Asst. Attys. Gen., Tax Div., Washington, D.C., for respondent-appellee.

Before WILLIAMS and GARWOOD, Circuit Judges, and NOWLIN, District Judge.[*]

NOWLIN, District Judge:

Bobbie J. Roberts ("Taxpayer") appeals from an adverse decision of the Tax Court. The Tax Court held that Taxpayer knew or should have known of a real estate kickback received by her husband in 1975 and should therefore be taxed on her community property interest in that kickback. The Tax Court also held that Taxpayer did not have reasonable cause for failing to timely file a tax return for the year 1975 and should therefore be liable for an addition to tax penalty. Because we find that the Tax Court applied the correct principles of law to fact findings that were not clearly erroneous, we AFFIRM the Tax Court's decision.

## I. BACKGROUND

Taxpayer married Charles Morgan ("Morgan") on December 13, 1970, and divorced him on August 17, 1976. In 1975, Morgan was a self-employed real estate broker who maintained an office for his business in the home he shared with Taxpayer, a licensed real estate broker since August 1974. Morgan purchased their house in May of 1974. The house consisted of 3,000 square feet, had four bedrooms and three baths, and was situated along the golf course of the Ridglea Country Club in Fort Worth, Texas. Taxpayer and Morgan purchased approximately $13,000 of furniture for their home in 1974 and 1975. They lived together in that house during the remainder of 1974 through 1975 during which time Morgan paid the costs of maintaining the house, including mortgage payments and real estate taxes. Morgan also furnished Taxpayer with living expenses during this period. Morgan moved out of the house in March of 1976 after his separation from the Taxpayer. Taxpayer remained in the house until her divorce in August of 1976.

In 1975, Taxpayer and Morgan shared a joint checking account at Ridglea State Bank ("Ridglea joint account"). She drove a 1974 Chevrolet Monte Carlo he purchased for her, and traveled with him in late 1975 on a snow-skiing trip to Purgatory, Colorado. Despite having had many of the modern amenities of life during 1975, Taxpayer soon experienced a rather painful change of circumstances in 1976 due in part to Morgan's real estate activities.

The particular real estate transaction which gave rise to the problems experienced by Taxpayer occurred in 1975. During that year, Morgan became a member of Interstate Investors, Inc. ("Interstate"), an investment group which was interested in purchasing a tract of land known as the Singing Hills property ("Singing Hills"). Interstate consisted of Morgan, Larry Ragland ("Ragland"), and other individuals they knew through a church in Fort Worth. In fact, Taxpayer and Morgan attended a Sunday school class taught by Ragland.

Ragland and Morgan had participated in other real estate investments prior to the Singing Hills deal. In those prior transactions, Ragland understood that Morgan would not receive compensation for services he provided in real estate acquisitions until Interstate sold the property. Ragland later discovered, unfortunately, that Morgan may have defrauded Interstate in the Singing Hills acquisition by receiving and accepting an illegal kickback. It is significant that Taxpayer testified she knew about the Singing Hills project and, in fact,

[*] District Judge of the Western District of Texas, sitting by designation.

had visited the property on more than one occasion in 1975 with Ragland and Morgan prior to its purchase.

On August 1, 1975, Interstate purchased Singing Hills. Without the knowledge of the other investors of Interstate, Morgan indirectly received a $268,541.40 payment or kickback in 1975 from the Sellers of Singing Hills. Morgan used $50,000 as part of Interstate's down payment on Singing Hills but deposited the balance of $218,541.40 in the Ridglea joint account. He eventually purchased four certificates of deposit, two of which he co-owned with Ragland. These certificates earned $2,412.83 of interest in 1975, all of which Morgan received. In addition to this interest income, Morgan received net long-term capital gains of $152.00 from the sale of certain property in connection with the Singing Hills transaction. He also received in 1975 his distributive share of ordinary loss of $78,013.00 as a partner in an equipment leasing firm.

During 1975, Taxpayer wrote several checks on the Ridglea joint account. On April 30, 1975, Taxpayer drew two checks: one in the amount of $10,000.00 made payable to "Charles N. Morgan Investment Account" and the other in the amount of $1,000.00 made payable to Morgan. Taxpayer drew two more checks on this same account in 1976, the last one being in April of 1976 after Taxpayer and Morgan had separated. Morgan also wrote checks on this account on June 16, July 8, August 17, and October 6 of 1975 for $900.00, $1,000.00, $700.00, and $1,000.00, respectively. All four checks were made payable to Taxpayer which she deposited in her own separate account at Continental National Bank.

Morgan and Taxpayer did not enjoy the happiest of marriages. Taxpayer testified that she and Morgan periodically separated prior to their final separation in March 1976 because of Morgan's interest in other women. In addition to these problems, Morgan was extremely secretive about the source of funds he provided Taxpayer to operate the community household. In late 1975, after repeatedly being warned by Morgan and realizing herself that they were living beyond their means, Taxpayer discovered that Morgan habitually carried large sums of cash on his person. When she questioned him about the funds, he angrily explained that the money actually belonged to someone else. It was at this time that Taxpayer first became suspicious of Morgan's financial affairs.

Before and after Taxpayer's separation from Morgan, Ragland repeatedly contacted Taxpayer and warned her of his suspicions that Morgan had defrauded the investment group. Since Morgan kept his files in his office at home, Ragland pressured Taxpayer to release Morgan's files to him in order to corroborate Interstate's allegations. Ragland also pressured Taxpayer to relinquish her entire claim and interest in the house and its belongings and threatened to sue her in addition to her husband for his fraudulent acts if she did not cooperate. As a result of these demands, Taxpayer turned Morgan's files over to Ragland for his inspection, and relinquished to him her interest in the homestead, the household property and furniture and certain stock.

After the separation in March of 1976, Taxpayer met her present husband, Larry Roberts ("Roberts"), whom she married in September 1976. At some point in June or July of 1976, Morgan shot at Roberts and attempted to run him off the road because of Robert's relationship with Taxpayer. Morgan also threatened to kill the Taxpayer and her son from a former marriage. These events evidently prompted her to file a divorce petition in June of 1976 in order to terminate her marriage. Taxpayer supplied her divorce attorney with the records and files Morgan kept on various real estate transactions. Taxpayer later retrieved these documents and delivered them to Ragland for his review which led to the discovery of Morgan's receipt of the kickback.

Significantly, Taxpayer expressly alleged in her divorce petition that Morgan might have incurred federal income tax liability, that he had concealed community property, and thus should be ordered to pay such

liability. The court entered the divorce decree on August 17, 1976 awarding Taxpayer the 1974 Monte Carlo, certain furniture she owned before the marriage, and all cash in her possession. Although Taxpayer had previously relinquished to Ragland her interest in the household furniture, Ragland eventually permitted her to keep the furniture.

In November 1976, an Internal Revenue Service agent contacted Taxpayer and informed her about her failure to timely file a 1975 income tax return.[1] Upon the agent's advice, Taxpayer filed her own separate return for the 1975 taxable year on November 29, 1976 reporting gross receipts of $3,819 from her own real estate activities with a net profit of $394.00.

On November 28, 1979, the Commissioner of Internal Revenue ("Appellee") issued a statutory notice of deficiency to taxpayer asserting a $59,204.33 deficiency. Appellee determined that Taxpayer was liable for one-half of the following community income:

| | | |
|---|---|---|
| a. | Interest Income | $ 12,693.04 |
| b. | Commissions and Finder's Fees | $137,140.07 |
| c. | Capital Gains | $ 76.00 |

Taxpayer, however, was allowed one-half of the following corresponding deductions related to such income:

| | | |
|---|---|---|
| a. | Itemized Deductions | $ 4,207.71 |
| b. | Ordinary Loss | $ 39,006.50 |

The Appellee also assessed against Taxpayer a $14,801.08 "addition to tax" penalty under 26 U.S.C. § 6651(a) because she had failed to file her 1975 tax return on time.[2]

On February 1, 1980, Taxpayer filed a petition in the United States Tax Court challenging the Appellee's imposition of tax liability for one-half of the community income and the addition to tax for the late filing. Taxpayer sought relief under 26 U.S.C. § 66(c) from liability for the community income and argued that she was not liable for the addition to tax penalty under the reasonable cause exception of section 6651(a). The Tax Court filed its Memorandum Findings of Fact and Opinion in Au-

gust of 1987 finding that Taxpayer knew or had reason to know of Morgan's commissions but that she did not know or have reason to know of the interest earned on the certificates of deposit funded by Morgan with the kickback from the Singing Hills. The Tax Court further upheld the addition to tax penalty finding that Taxpayer did not demonstrate the existence of reasonable cause for her failure to timely file her return.

Taxpayer appeals from that decision raising two main issues:

(1) whether the Tax Court erroneously concluded that Taxpayer knew or should have known of the community income earned by Morgan in 1975 in the form of a real estate kickback; and

(2) whether the Tax Court erroneously concluded that Taxpayer did not have reasonable cause for failing to file a tax return timely for the year 1975.

We now address those issues and review the lower court's findings under the appropriate standard of review.

## II. DISCUSSION

### A. *Section 66(c) Relief*

■ The Tax Court correctly reasoned that under Texas law, all of Taxpayer's and Morgan's 1975 income including Morgan's real estate commissions constituted community income and that taxpayer faced a tax liability for one-half of the aggregate amount of that income less community expenses unless relief was available under 26 U.S.C. § 66(c). Section 66(c) provides relief for an "innocent spouse" from tax liability for unreported community income only if the following conditions are satisfied:

Under regulations prescribed by the Secretary, if

(1) an individual does not file a joint return for any taxable year,

(2) such individual does not include in gross income for such taxable year

---

1. On August 26, 1981, Morgan pled guilty to wilfully and knowingly failing to file an income tax return for 1975 in violation of section 7203 of the Internal Revenue Code.

2. A $2,960.22 addition to tax under section 6653 (negligent or intentional disregard of Rules and Regulations) had also been asserted by Appellee but was conceded before trial.

an item of community income properly includible therein which, in accordance with the rules contained in section 879(a), would be treated as the income of the other spouse,

(3) the individual establishes that he or she did not know of, and had no reason to know of, such item of community income, and

(4) taking into account all facts and circumstances, it is inequitable to include such item of community income in such individual's gross income,

then, for purposes of this title, such item of community income shall be included in the gross income of the other spouse (and not in the gross income of the individual).

26 U.S.C. § 66(c); *see also* Staff of Joint Committee on Taxation, 98th Cong.2d Sess., *General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984* at 720–722 (1984).

In this particular case, Appellee conceded at trial that the first two conditions for relief under section 66(c) were satisfied. The Tax Court thus considered the third prerequisite which required an examination of both the subjective and objective knowledge of taxpayer with respect to the contested item of community income, namely the Singing Hills kickback. The Tax Court specifically found that taxpayer either knew or had reason to know of the commissions and/or fees received by Morgan in providing real estate brokerage services.

 In deciding whether to uphold this finding, we must review the finding under the "clearly erroneous" standard. *See Sanders v. United States*, 509 F.2d 162, 165–166 (5th Cir.1975); *Millette & Associates, Inc. v. Commissioner*, 594 F.2d 121 (5th Cir.1972). A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Rutter v. Commissioner*, 853 F.2d 1267, 1272 (5th Cir.1988) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). A finding of fact, turning as it

does entirely on a credibility determination by the trial judge, comes to us with a strong presumption of correctness. *Sanders v. United States*, 509 F.2d 162, 166 (5th Cir.1975). After a review of the record from below, we conclude that the Tax Court's finding that Taxpayer knew or should have known of Morgan's earned commission or fee from the Singing Hills transaction is not clearly erroneous.

In order to have prevailed on this issue before the Tax Court, Taxpayer had the burden of showing that on the date she filed her return, November 29, 1976, she did not know or have reason to know of the Singing Hills kickback. As the Tax Court correctly noted, Taxpayer knew that Morgan had participated in real estate transactions during 1975. As a licensed real estate broker familiar with the real estate business, she knew that Morgan's participation in those transactions would generate income in the form of commissions or fees. Taxpayer testified that she knew of the Singing Hills development and that she visited the Singing Hills property with Morgan and Ragland on more than one occasion prior to the closing of the transaction. She therefore knew or had ample reason to know that Morgan would be compensated for the services he provided in that transaction even though she might not have known of the exact amount of compensation. She maintained a joint checking account with Morgan in which he deposited the kickback funds he earned from the deal. On several occasions prior to the filing of her 1975 return, Taxpayer and Morgan drew checks on this account payable to each other. The fact that Morgan deposited a portion of the kickback funds in this joint account leads to the reasonable conclusion that taxpayer either knew or should have known of that particular income.

Furthermore, Taxpayer admitted that she realized nearly a year before she filed her return that something was "amiss" when she discovered Morgan was carrying large sums of cash. She disputes the Tax Court's characterization of her life style as "comfortable and expensive," even though

she testified that she and Morgan occupied a recently-purchased and fully-furnished home adjacent to a private country club golf course, drove relatively new automobiles and flew to Colorado for a winter vacation. The life style she enjoyed during 1975 coupled with her own recognition that she had a personal gross income of only $3,819.00 and that she and Morgan were living beyond their means make it reasonable to conclude that she at least had reason to know that Morgan was supplementing the community coffers with income he had earned from transactions, including Singing Hills, which Taxpayer knew he had participated in during 1975.

Taxpayer also testified that Ragland's demands for Morgan's files and Taxpayer's interest in the marital estate as well as Ragland's accusations of fraud against Morgan caused her severe emotional strain. While it is difficult to challenge Taxpayer's assertions of emotional distress, it is also difficult to understand why Taxpayer surrendered her entire interest in a substantial portion of her real and personal property to a fellow church member and friend without inquiring about the specific transactions in which Morgan committed the alleged fraud. A reasonable and prudent person who was threatened with the loss of substantially all her assets because of alleged misdeeds committed by her spouse would make some inquiry as to the basis of those allegations. We believe that in this case Taxpayer should have made that inquiry which would have given her actual knowledge of the Singing Hills kickback.

Furthermore, the Tax Court, contrary to Taxpayer's assertions, did not make an inconsistent finding when it found that Taxpayer did not know or have reason to know of the interest income generated by the certificates of deposit created with kickback funds. This secondary finding involved a completely different "item" of community income, namely interest income. The "items" of community income considered in the first finding were commissions or fees income. The Taxpayer challenges this secondary finding, apparently in an effort to show that the first finding was clearly erroneous. Reviewing the record

as we must in accordance with the applicable standard of review, we find that the Tax Court's finding with respect to the interest income does not render its finding with respect to the commissions and/or fees clearly erroneous. For these reasons, we find that the Tax Court properly decided to include Morgan's kickback as a part of Taxpayer's taxable income since it was not clearly erroneous to find that Taxpayer knew or should have known of that item of community income.

### B. *The Section 6651 Addition to Tax*

In addition to contesting the Tax Court's section 66(c) determination, Taxpayer attacks the validity of the Tax Court's finding that the Appellee's assessment of a delinquency penalty under section 6651(a)(1) was proper. Title 26, United States Code, Section 6651(a)(1) provides in pertinent part:

**§ 6651. Failure to file tax return or to pay tax**

**(a) Addition to the tax.** In case of failure—

(1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate[.]

"Reasonable cause" has been defined by regulation: "If the taxpayer exercised ordi-

nary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." 26 C.F.R. § 301.6651–1(c)(1) (1988). The Internal Revenue Service has identified specific causes for failure to timely file a return that it considers to constitute "reasonable cause." These causes include:

(1) unavoidable postal delays;

(2) the taxpayer's timely filing of a return with the wrong IRS office;

(3) the death or serious illness of the taxpayer or a member of his immediate family;

(4) the unavoidable absence of the taxpayer;

(5) destruction by casualty of the taxpayer's residence, records or place of business;

(6) the taxpayer's reliance on the erroneous advice of an IRS officer or employee;

(7) the failure of the IRS to furnish the taxpayer with the necessary forms in a timely fashion;

(8) the inability of an IRS representative to meet with the taxpayer when the taxpayer makes a timely visit to an IRS office in an attempt to secure information or aid in preparation of a return;

(9) the taxpayer's inability to obtain necessary records for determining amount of tax liability for reasons beyond his control; and

(10) the taxpayer's failure to file is based upon his reasonable reliance upon the advice of a tax advisor that the return need not be filed.

Internal Revenue Manual (CCH) § 4562.2 (Feb. 25, 1987); *see also* Internal Revenue Manual (CCH) ¶ 1303–53, Policy Statement P–2–7 (December 29, 1970).

In accordance with section 6651(a)(1), the Appellee assessed against Taxpayer an additional tax of $14,801.08 as a penalty because Taxpayer had failed to file her 1975 tax return until November 29, 1976, more than seven months late. The Appellee had concluded that reasonable cause did not exist as of the prescribed filing date, April 15, 1976, which would have excused Taxpayer's delinquency. Taxpayer challenged this assessment before the Tax Court claiming that the combined effect of her continuing marital problems with Morgan, her lack of knowledge of the items of income received by Morgan in 1975 and the pressure she received from Ragland concerning her husband's affairs, constituted reasonable cause for failing to file before April 15, 1976. The Tax Court rejected her arguments and, with the following brief statement, discussed the basis for its decision sustaining Appellee's penalty assessment:

> As stated earlier, petitioner knew, or should have known, that Morgan received income from his real estate transactions which should have been reported not only by Morgan but by herself as community income. She was aware that a tax liability existed, as evidenced by a statement contained in her Petition for Divorce. She also was aware of the income produced by her own real estate efforts. While we sympathize with petitioner's plight and emotional distress, most (if not all) of the problems encountered by her were subsequent to the required filing date (April 15, 1976).

■ Taxpayer argues strenuously on appeal that the Tax Court erred in its determination of the reasonable cause issue and claims that such determination, in light of the testimony presented at trial, is unjustifiable. In reviewing this finding by the Tax Court, we are guided by the Supreme Court's declaration that whether the elements that constitute "reasonable cause" are present in a given situation is a question of fact, but what elements must be present to constitute "reasonable cause" is a question of law. *United States v. Boyle*, 469 U.S. 241, 250 n. 8, 105 S.Ct. 687, 692 n. 8, 83 L.Ed.2d 622 (1985). It is well-settled that in order to avoid the penalty prescribed by section 6651(a), Taxpayer bears the heavy burden of proving that the failure did not result from "willful neglect," and that the failure was "due to reasonable cause." 26 U.S.C. § 6651(a)(1). *Boyle*, 469

U.S. at 246, 105 S.Ct. 690. In this case, willful neglect is not at issue. The central focus of our inquiry therefore is whether the Tax Court properly determined that no reasonable cause existed to excuse Taxpayer's delinquent return filing. In accordance with *Boyle*, we shall review the Tax Court's findings regarding the existence or presence of circumstantial factors which might give rise to reasonable cause under the clearly erroneous standard. *See also Millette & Associates, Inc. v. Commissioner*, 594 F.2d 121, 125 (5th Cir.1972).

A review of the record demonstrates that the Tax Court's finding that the circumstantial factors which existed as of April 15, 1976 did not constitute reasonable cause is not clearly erroneous. Taxpayer was a licensed real estate agent. She had access to the books and records which would have enabled her to compute her tax liability since Morgan stored these materials in his office in their home. She apparently made no effort to ascertain the correct income of the family and failed to begin to determine her own separate tax liability until after being contacted by an IRS agent in November of 1976. In addition, she knew that she had earned a separate gross income from her own 1975 real estate activities and she possessed the documentation underlying those transactions which would have enabled her to file a timely return. Under these circumstances, the Tax Court's finding that Taxpayer failed to demonstrate the existence of reasonable cause for failing to comply with the April 15, 1976 deadline is not clearly erroneous and should be upheld. *See Beatty v. Commissioner*, 676 F.2d 150, 152 (5th Cir.1982); *Electric and Neon, Inc. v. Commissioner*, 56 T.C. 1324, 1342–44 (1971) [available on Westlaw, FTX–TCT Database], *aff'd*, 496 F.2d 876 (5th Cir.1974).

In conclusion, we find that the Tax Court properly determined that Taxpayer did not qualify for relief from tax liability under 26 U.S.C. § 66(c). We further find that the Tax Court properly upheld the imposition of a delinquency penalty upon Taxpayer in accordance with 26 U.S.C. § 6651(a)(1).

For the foregoing reasons, the decision of the Tax Court is AFFIRMED.